# IN THE COURT OF APPEALS OF IOWA

No. 22-0046
Filed March 30, 2022

**IN THE INTEREST OF J.J., C.J., and E.J.,**
**Minor Children,**

**G.J., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.

A mother appeals the termination of her parental rights.  **AFFIRMED.**

Robert W. Davison, Cedar Rapids, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Robin L. O'Brien Licht, Cedar Rapids, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

A mother, Giada, appeals the termination of her parental relationship with fourteen-year-old J.J., thirteen-year-old C.J., and ten-year-old E.J.[1]  She argues (1) the State failed to establish a basis for termination; (2) termination was not in the children's best interests, (3) termination was improper because of the bond that she and an older brother share with these children; and (4) she would be ready to parent after a six-month extension.  Because the State proved its case and termination is the best path forward, we affirm.[2]

## I.  Facts and Prior Proceedings

The Iowa Department of Human Services (DHS) became involved with this family most recently in late 2020.[3]  In mid-October, the DHS received a report that Giada was abusing methamphetamine, cocaine, and heroin in her Cedar Rapids home.[4]  Less than a week later, police executed a search warrant for Lee's Knoxville home where they found marijuana, methamphetamine, and drug paraphernalia.  At the scene, Lee admitted he was "selling a bit."  He was later charged with possession with intent to distribute and child endangerment.

---

[1] The juvenile court also terminated the parental rights of their father, Lee.  He does not appeal.  The termination order did not involve their older son, Co.J.

[2] Termination reviews are de novo.  *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018).  We give weight to the juvenile court's fact findings, but they do not bind us.  *Id.*

[3] The DHS had previous interactions with this family.  In the past, the DHS investigated allegations of substance abuse, domestic violence, and inadequate supervision.

[4] Giada and Lee were then living apart.  At first, all four children lived with Lee.  But in short order the two youngest, C.J. and E.J., returned to Giada.  Soon after J.J. returned too.  By October 2020, Co.J. lived with Lee and the three younger children lived with Giada.

In early November, the DHS drug tested all four children. Each of their hair samples tested positive for methamphetamine, and Co.J.'s and J.J.'s hair tested positive for THC.[5] Around this time, the children were adjudicated in need of assistance (CINA) and removed from their parents' homes.

Following their removal, the four children were separated—Co.J. in a residential treatment program, J.J. and E.J. with one foster family, and C.J. with another. Co.J. didn't do well in his placement, regularly running away.[6] But the younger three children fared better. Their foster families have provided stable home environments, addressed the children's mental health concerns, and ensured regular visits among the siblings. J.J., C.J., and E.J. have all asked to be adopted and their foster parents are open to adoption.

As for Giada, she has struggled since the children were removed. For most of the yearlong removal period, she lacked stable housing, employment, and transportation. She did not engage with mental-health services, often missing therapy sessions and medication appointments. And she did not comply with substance-abuse testing or treatment recommendations. She provided only one test of the roughly fifty offered and was discharged from a substance abuse program for nonattendance. In August 2021, she was charged with possession of

---

[5] At the termination hearing, Giada denied exposing the children to drugs. She believes the children were exposed while living with Lee, noting that hair-based testing has a long detection window. Lee also denied using drugs around his children.

[6] Because his placement was not working out and he was nearly eighteen, the DHS dismissed Co.J.'s CINA case in November 2021. Since then, he has been living with Giada.

drug paraphernalia.[7]  On a positive note, Giada regularly attended the weekly, fully-supervised visitation sessions.

In September 2021, the State moved to terminate parental rights.  After a December hearing, the juvenile court approved termination.  Giada now appeals.

## II.  Analysis

Our review follows a three-step process.  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).  First we look for a termination ground.  Iowa Code § 232.116(1) (2021).  Then we consider the children's best interests.  *Id.* § 232.116(2).  And finally, we examine factors weighing against termination.  *Id.* § 232.116(3).

### A.  Termination Basis

The court terminated parental rights under Iowa Code section 232.116 (2021), paragraph (f).  Under that paragraph, a court may terminate rights if:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

*Id.* § 232.116(1)(f).

Giada takes aim at the fourth element, arguing "there are minimal safety concerns," and emphasizes her recent progress toward reunification.  The State offers two rebuttals.  Procedurally, it contests error preservation, arguing Giada

---

[7] The criminal complaint alleged her possession of a "glass pipe with burnt residue consistent with methamphetamine."  At the December termination trial, Giada testified that the pipe was not hers.

only asked the juvenile court for more time to reunify. On the merits, the State highlights Giada's non-engagement with treatment as evidence that the children could not be returned safely.

Error preservation first—we agree with the State. Giada's focus during trial was twofold, but neither challenged the ground for termination. As the State presented its case, Giada's attorney homed in on the children's best interests.[8] And while presenting her case, Giada pointed to her recent progress and asked for six more months to prove she could safely care for the children.

Even if Giada had preserved error, we see clear and convincing evidence for termination. *See id.* § 232.116(1)(f)(4). The children were removed because of drug exposure. Despite this concern, Giada did not acknowledge a problem with substance abuse. During trial, she denied abusing methamphetamine, cocaine, or heroin.[9] Instead, she claimed her only vice was alcohol. She tried to shift blame, arguing Lee was responsible for the children's positive drug tests and insisting she shouldn't "be held accountable for his actions." So, having denied the problem's existence, Giada failed to engage with DHS services. She was inconsistent with both mental health and substance abuse treatment. And, with one exception, she missed all drug testing. *See In re C.F.*, No. 20-1067, 2020 WL

---

[8] For instance, while cross examining the DHS worker, Giada's attorney asked "regardless of whether the grounds for termination exist, the court also has to find that termination is in the kids' best interest, correct?"

[9] At first, Giada argued that her family, not her, had a history of methamphetamine use. When pressed, she conceded she did have a personal history, but it was ancient history, twenty years having passed since her last usage.

But her testimony is contradicted by medical records. According to an April 2021 evaluation, Giada told her doctor she "had used meth for three months straight."

6482073, at *1 (Iowa Ct. App. Nov. 4, 2020) ("We presume these missed drug tests would have resulted in positive tests." (citation omitted)).

True, Giada logged belated progress by securing employment and stable housing a few weeks before the termination hearing.[10] But those measures did not erase the months of inaction on other safety concerns.

## B. Best Interests

Next, we consider the children's best interests. Giada believes termination does not serve their long-term needs. Supporting this claim, she notes the close bond between herself and these three children, as well as their relationship with older brother Co.J.[11]

Statutory factors guide the best-interests analysis. *See, e.g.*, *In re P.L.*, 778 N.W.2d 33, 35 (Iowa 2010). We give primary consideration to the children's safety, to the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional condition and needs. Iowa Code § 232.116(2). For a child placed in family foster care, this consideration may include "whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family." *Id.* § 232.116(2)(b).

---

[10] We discuss Giada's recent progress in depth below.
[11] In a common shortcut, Giada's petition treats the parent-child close-bond exception as a best-interests argument under Iowa Code section 232.116(2). Because close bonds implicate a permissive exception under Iowa Code section 232.116(3), we consider that argument under a separate subheading.

These principles in mind, we believe termination is in the children's best interests. The children have been removed from their parents' custody for over a year. Since then, they have thrived with their foster families. C.J., the middle child, loves his foster parents and has expressed his desire to live with them "tomorrow, next year, [or] until he was eighteen." Like C.J., J.J. and E.J. are doing well in their placement. Their caseworker noted that they're "like two different kids" since moving in with their foster parents. What's more, all three children have made their desire for adoption clear and their foster families want to adopt them.

True, termination would impact the siblings' relationships with each other, cementing separate living arrangements. But, on balance, we think termination better serves their needs. *See In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006) (noting a preference to keep siblings together, but confirming the preference is not absolute because the ultimate concern is the best interests of the child). Both foster families try to minimize that separation. Indeed, they arrange several visits per week and sometimes do overnights. We appreciate Giada's concerns that Co.J. has not been included in these visits. But we must consider the younger children's best interests.[12] And we believe they are better served by permanency. Indeed, the children seem to agree. According to his caseworker, C.J. wants to be adopted by his foster parents even though that "would mean he wouldn't be living with his siblings."

---

[12] What's more, Co.J is only a few months from adulthood. So his relationship with his younger siblings would no longer depend on preserving Giada's parental rights.

### C. Permissive Factor

Giada also cites her close relationship with the children in arguing against termination. Giada must show, by clear and convincing evidence, that termination would harm her children. Iowa Code § 232.116(3)(c). That harm must outweigh the concerns over her inability to care for them. *See D.W.*, 791 N.W.2d at 709. The close-bond exception is permissive, not mandatory, so we afford juvenile courts considerable discretion. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

Giada did not meet her burden, failing to present clear and convincing evidence of the detriment to her children. We have no doubt that she shares a strong bond with the children. But all three have asked to be adopted and understand the consequences of termination and adoption.

### D. Deferred Permanency

Finally, based on her recent progress, Giada asks for more time to work toward reunification.[13] A court may, at its discretion, defer permanency if it can "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b); *see also A.M.*, 843 N.W.2d at 113.

No question, Giada has made strides. She has found stable housing. She is holding down a job. And she's been providing a home for Co.J. for about a

---

[13] The State argues this issue is waived because it was "only mentioned in passing in [the] petition on appeal." But petitions on appeal are, by design, more cursory than traditional briefing. And despite the quick analysis, Giada references pertinent facts and relevant authority. *See* Iowa R. App. P. 6.903(2) (discussing waiver standard). So we proceed to the merits.

month. Although we credit these steps, we believe the juvenile court was justified in denying the extension. Giada's progress came late in the game—about thirteen months into the proceedings and just a few weeks before the termination hearing. In fact, a month before the hearing, Lee suggested Giada couldn't care for the children because she was unstable. When faced with twelve months of Giada's non-engagement, the juvenile court declined to speculate from a few weeks of buzzer-beating improvements. *See In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020). Because patience with Giada can lead to "intolerable hardship" to the children, we agree with the court's decision. *See In re E.K.*, 568 N.W.2d 829, 831 (Iowa Ct. App. 1997).

As for Co.J, yes, he moved in with Giada. But it was his action, not Giada's, that prompted the reunion. Co.J. regularly fled from the treatment center, at times choosing to live on the streets. Because he was "essentially living an independent life" and only months from adulthood, the DHS felt that "a roof over his head [is] better than him running the streets." Preferring the lesser of two evils, the State dismissed his CINA case.

## III. Conclusion

Because the State met its burden of proof and termination offers the best option for ensuring a secure future for the children, we affirm.

**AFFIRMED.**